706 P.2d 1213

**STATE of Arizona, Appellee,**

v.

**Stephen James KREPS, Appellant.**

No. 6392.

Supreme Court of Arizona,
En Banc.

Sept. 23, 1985.

Robert K. Corbin, Atty. Gen., William J. Schafer III, Chief Counsel, Georgia Ellexson, Asst. Atty. Gen., Phoenix, for appellee.

Kenneth Freedman, Phoenix, for appellant.

GORDON, Vice Chief Justice.

After a jury trial, defendant, Stephen James Kreps, was convicted of first degree murder in the shooting death of his girl friend, Tammi Zingarelli. The trial court filed a special verdict pursuant to A.R.S. § 13–703 and sentenced defendant to life imprisonment without the possibility of parole for 25 years.

During the early morning hours of January 9, 1984, numerous tenants of a Phoenix apartment complex were awakened by an argument between a man and woman and by gunshots. The testimony of these witnesses differed in some respects.

Debra Polson testified that she slept with her bedroom window open on the morning of January 9. An argument in a nearby apartment woke her. She heard a man yell: "Are you * * * going out on me again?" The woman replied: "No. I love you. No. I love you only." This dispute continued for 20 minutes until Ms. Polson heard the woman yell in terror, "No. No. No." Ms. Polson then heard a shot. Ms. Polson's boyfriend called the police. After the phone call to the police, Ms. Polson heard two more shots fired in close succession. Ms. Polson estimated that two minutes passed between the first and second shot.

Larry Savage stated that he awoke at 4:15 a.m. to the sounds of a woman yelling, "But I do love you. I do love you." Mr. Savage's bedroom window was also open, and he heard the argument continue for approximately a half hour. At about 4:40 a.m. Mr. Savage heard a shot then a woman scream: "Please don't. God. Please don't. Please let me go." Right as the woman yelled "God please let me * * *" Mr. Savage heard a second shot, a pause, then a third shot. Mr. Savage estimated the time between the first and second shots at between five and ten seconds. He thought it took 15 seconds for all three shots to be fired.

Ben Tewayguna woke up about 4:30 a.m. to the noises of arguing in the apartment above his own. He could not make out many words but thought he heard a woman say "I love you", and a man say "Come on. Let's go. Come on. Get up." He then heard a bang which he thought was the woman being thrown against the wall. The woman then yelled "Oh, God, I'm bleeding." About five seconds later he heard another banging, and then he heard a person moaning upstairs. Mr. Tewayguna saw policemen looking around the apartment complex but made no effort to contact them and went back to sleep.

Mitzie Tewayguna, Ben Tewayguna's wife, testified that she heard three shots. The second and third shots followed the first by about five minutes.

Phil Messec who also slept with his window open said he woke up at about 4:00 a.m. to the sounds of a woman screaming "I love you. I love you. Let me go. Let me go." He then heard a gunshot and a woman scream, "Please don't—please don't." It sounded to Messec as if the woman were begging for her life. A minute or a minute and a half later he heard two more gunshots in close succession. He called the police after the first gunshot. Two patrolmen arrived on the scene at about 5:00 a.m. and met several of the tenants. The tenants stated that they heard the screams and shots coming from the west parking lot of the complex. The police looked around that area but found nothing. They left after about twenty minutes.

At about 7:30 a.m. defendant called his friend, Dan Staerker, and told him "Tammi is dead." Defendant told Mr. Staerker that he and Tammi had argued, that defendant got his pistol and was about to kill himself,

but that Tammi grabbed the gun and it went off, killing her. Defendant told Mr. Staerker not to call the police and that he didn't want to go to jail. He also spoke of taking Ms. Zingarelli's car and driving back to his native Nebraska. During this conversation, Mr. Staerker wrote a note to his wife, telling her to call the police from the corner phone booth and to send them to defendant's apartment.

The police arrived at the scene, and defendant came out of the apartment he shared with Tammi Zingarelli holding a Bible and crying. Police gave defendant his *Miranda* warnings, and he said he understood them. Sergeant Jennings then asked defendant what happened. Defendant stated:

"She's been living with the guy for three months. She was going to leave me. We got in an argument. I was going to commit suicide. I had the gun pointed at my head. It went off. She got it, not me. I got on my knees and cried. She pulled the trigger, not me. Her family is going to crucify me. She came to see me to tell me she was leaving. Please let me have my Bible. I want to hold it and turn it to Psalm 23."

Police found Tammi Zingarelli's body in the apartment. She had three gunshot wounds: one to her left thigh, which was not fatal; one to her cheek that exited the back of her neck; and one to the upper part of the middle of her back that exited near the cheek wound. Either of the second two shots was in itself fatal and almost immediately incapacitating. A pistol was also found lying next to her body.

In addition, police found a handwritten "suicide note" in the apartment. It stated:

"To Whom It May Concern:
Tammi Lou-Ann Zingarelli killed herself during a scuffle with my gun—but I cannot live without her—so I die—committ [sic] my soul to the Lord—I loved Tammi—more than anything or anyone in this world—

I am a vet—call the V.A.—and my folks— I am an American but I can hurt no more—

Stephen J. Kreps
alias (Steve Faye)"

At trial, defendant maintained that he was insane at the time of the killing. He testified that he loved Tammi Zingarelli, but that during the early morning of January 9, 1984 she suddenly announced that she was leaving him. Until that time defendant had believed he and the victim had worked out their differences. He said he became despondent. He went to his bedroom, retrieved his pistol, and threatened to kill himself. Ms. Zingarelli, however, grabbed the pistol in an effort to stop him. Defendant said the last thing he remembers was the gun going off. He then blacked out. He later woke up and found Tammi Zingarelli dead.

Defendant presented medical testimony which concluded that defendant possibly did not know right from wrong during the crime and was, therefore, legally insane. Defendant's expert, however, acknowledged that it was possible that defendant was legally sane at the time of the murder. The state presented two medical experts in rebuttal who stated that defendant was legally sane at the time of the murder.

Defendant raises numerous issues.[1]

## I. Sufficiency of Evidence Proving Premeditation

Defendant first argues that insufficient evidence existed supporting a finding of premeditation. According to defendant, the evidence, at best, shows that Tammi Zingarelli's shooting came about as the result of a sudden quarrel or heat of passion, thus precluding a finding of premeditation. A.R.S. § 13–1101.

Premeditation is defined in A.R.S. § 13–1101:

"1. 'Premeditation' means that the defendant acts with either the intention or

---

1. The state claims that defendant failed to file a proper notice of appeal for the bulk of the issues raised. The state is wrong. Defendant properly filed a timely notice of appeal with the superior court which was transmitted to this Court.

**449**

the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion."

▆ The state bears the burden of proving premeditation beyond a reasonable doubt. *State v. White,* 144 Ariz. 245, 697 P.2d 328 (1985). To make this showing, the state "must prove that the defendant made a decision to kill prior to the act of killing, that 'a plan to murder was formed after the matter had been made a subject of deliberation and reflection.'" *State v. Lacquey,* 117 Ariz. 231, 234, 571 P.2d 1027, 1030 (1977), *quoting Macias v. State,* 36 Ariz. 140, 149, 283 P. 711, 715 (1929). The necessary premeditation, however, may be as instantaneous as successive thoughts of the mind and may be proven by either direct or circumstantial evidence. *State v. Hunter,* 136 Ariz. 45, 48, 664 P.2d 195, 198 (1983).

▆ In deciding whether the evidence was sufficient to prove premeditation,

"[t]his Court will not engage in re-weighing the evidence. It will be viewed in the light most favorable to sustaining the conviction and all reasonable inferences will be resolved against a defendant. The test to be applied is whether there is substantial evidence to support a guilty verdict. In the recent case of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) it was held that due process requires a court to utilize as the standard of review whether there was sufficient evidence that a rational trier of fact could have found guilt beyond a reasonable doubt." (Citations omitted.)

*State v. Tison,* 129 Ariz. 546, 552, 633 P.2d 355, 361 (1981), *cert. denied,* 454 U.S. 960, 102 S.Ct. 499, 70 L.Ed.2d 376 (1981), *reh'g denied,* 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982).

▆ Applying this standard, we find that a rational trier of fact could have found that defendant premeditated the murder of Tammi Zingarelli. Though defendant testified that Ms. Zingarelli grabbed for his gun as he attempted suicide, that the gun went off, that he blacked out, and that he awoke later finding her dead, the jury could have believed other evidence contradicting this version.

Specifically, the jury could have believed defendant first shot the victim during a struggle for his gun but that he then decided to kill Tammi Zingarelli. Witnesses at the apartment complex heard arguing and then a gunshot. Some of them heard the woman screaming in terror after the first shot and begging for her life. After a substantial pause, some of the witnesses then heard a second and third shot in close succession. The pause between the first shot and the second was estimated by the various witnesses at as little as five seconds to as much as around five minutes. The jury could have believed the higher estimates. In any event, the victim had enough time between the shots to exclaim that she was bleeding and to beg for her life. Even if the jury believed the first shot resulted from a sudden quarrel or heat of passion, the pause between the first and second shots suggests a period of time in which defendant could contemplate his act.

Furthermore, the physical evidence also suggested a period of deliberation between the non-fatal first shot and the second and third fatal shots. The evidence showed that Tammi Zingarelli was first shot in the left thigh, next on the left cheek, and, finally, in the back. After being shot in the thigh, Ms. Zingarelli could still speak, and she asked defendant for mercy. Indeed, blood flow from the thigh wound indicated the victim was still standing after the first shot. After a significant pause, however, defendant shot her in the face. The evidence suggested that Ms. Zingarelli then fell to the floor. As she lay face down on the floor, defendant then shot her in the back. The bullet from this back wound was later found embedded in the floor below where Ms. Zingarelli was lying.

The jury could have also disbelieved defendant's claim that he blacked out after

the first shot. Defendant's treating physician, Dr. Jack Potts, testified that he knew it was extremely difficult for people who black out to commit deliberate acts. Dr. Potts surmised that the defendant did not black out at the time of the killing, but instead erased the memory from his mind after realizing what he had done. Furthermore, despite defendant's claim that his blackout was caused by a head injury he received in the struggle with Tammi Zingarelli, the doctor who treated defendant the day of the murder testified that defendant had no head injury at all. In addition, despite his claimed blackout, the apartment dwellers below defendant's apartment heard the defendant pacing the floor after the shooting was over. Other evidence suggested that defendant sat up drinking beer after the killing. Finally, the jury could have believed the substantial medical testimony suggesting defendant was aware of what he was doing and that it was wrong.

■ Though much of the evidence conflicted, more than sufficient evidence exists to sustain the jury's verdict. On appeal, this court will not substitute its judgment for that of the jury. *State v. Childs*, 113 Ariz. 318, 553 P.2d 1192 (1976); *Moore v. State*, 65 Ariz. 70, 174 P.2d 282 (1946).

## II Prosecutor's Statements in Closing Arguments

Defendant argues that the following statements made by the prosecutor in closing arguments denied defendant a fair trial.

"Sure, he's never been arrested before but is he such a good guy? He didn't work for two and a half years. Sure, it's a tough time, but he lived off that girl for most of the time, he wasn't working, he was a lazy person that sat around the apartment all the time feeling sorry for himself."

■ Defendant failed to object to these statements and, therefore, has waived this issue absent fundamental error. *State v. Thomas*, 130 Ariz. 432, 636 P.2d 1214

(1981); *State v. Rodriquez*, 145 Ariz. 157, 700 P.2d 855 (App.1984).

■ We find no fundamental error. Some evidence suggested that defendant was unemployed for a long period of time and that he lived with Tammi Zingarelli during this period. One of the defendant's friends testified that defendant did not collect unemployment benefits during this time, thus disputing defendant's claim that he split expenses with the victim. One of the defendant's other friends testified that defendant exhibited a "poor me" attitude when experiencing difficulties with women. Although we find the prosecutor's words harsh, they are supported by the record.

## III Form of Verdict

■ Defendant next contends that the form of verdict regarding insanity was an improper comment upon the evidence. As defendant did not object to this form of verdict at trial the issue is waived absent fundamental error. *Cf. State v. Vickers, supra.* The form of verdict stated: "Not responsible by reason of insanity." Defendant claims it was fundamental error for the form not to read "Not *guilty* by reason of insanity." We disagree.

■ We first note that A.R.S. § 13–502, which outlines the insanity defense, is entitled "Not responsible for criminal conduct by reason of insanity; burden of proof; findings." We would be hard pressed to find any error, let alone fundamental error, when the trial court entitles a form of verdict the same way as the statute upon which the verdict form is based. More importantly, the common and ordinary meaning of "guilt" is *"responsible* for an offense." Webster's Third New International Dictionary (G. & C. Merriam Co. 1976) (emphasis added). Thus, there was no need for the trial judge to instruct the jury that "not responsible" means "not guilty." *Cf. State v. Bice*, 127 Ariz. 312, 620 P.2d 227 (App.1980) (trial court not required to define a term in instructions

when it is one of ordinary significance). Furthermore, the trial court properly instructed the jury on the insanity defense. Thus, the jury knew its duty in that regard. There was no fundamental error.

Defendant has raised a number of other issues in a *pro persona* brief. We have fully considered his arguments and find them without merit. Additionally, we have searched the entire record for fundamental error, A.R.S. § 13–4035, and have found none. We affirm the conviction and sentence.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.