768 P.2d 1177

STATE of Arizona, Appellee,

v.

Robert Wayne VICKERS, Appellant.

No. CR–86–0147–AP.

Supreme Court of Arizona, In Banc.

Jan. 31, 1989.

---

Robert K. Corbin, Atty. Gen. by William J. Shafer, III and Jack Roberts, Asst. Attys. Gen., Phoenix, for appellee.

Lorona & Associates by Jess A. Lorona, Mesa, for appellant.

CAMERON, Justice.

## I. JURISDICTION

Defendant, Robert Wayne Vickers, appeals his conviction and sentence of death for the first degree murder of Wilmar "Buster" Holsinger. A.R.S. § 13–1105(A)(1); A.R.S. § 13–703; Ariz.R. Crim.P. 31.2(b), 17 A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and –4033.

## II. QUESTIONS PRESENTED

We must address the following issues:
1. Were defendant's due process and equal protection rights violated because the trial court denied defendant's motion for further medical testing?
2. Did the trial court err in ruling that the state could impeach potential defense witnesses regarding their membership in the Aryan Brotherhood?
3. Did the trial court err in finding that defendant's statements made after the fire were voluntary?
4. Did the trial court err in admitting prior bad acts of the defendant?
5. Did the state prove beyond a reasonable doubt that the murder was premeditated?
6. Did the state prove beyond a reasonable doubt that defendant was sane when he committed the offense?
7. Did the trial court err in failing to instruct the jury on the lesser-included offense of manslaughter?
8. Is defendant's death sentence unconstitutional?

## III. FACTS

On 4 March 1982, the defendant Robert Wayne Vickers, a prisoner on death row, was released from his cell at approximately 5:00 p.m. to do porter duties. This included picking up trash around the cell pod after meals and also allowed the inmates time out of their cells to shower and talk with other inmates locked in their cells. The pod contained four cells with one inmate housed in each cell. Sometime between 5:00 and 6:45 p.m., Vickers showed the victim, Wilmar "Buster" Holsinger, a picture of his niece and her crayon drawing which Vickers had received in the mail that day. Upon seeing the pictures, Buster asked Vickers if, referring to Vickers' niece, he had ever "eaten her out."

Vickers was angered by this statement and sometime around 6:45 p.m. he poured five bottles of Vitalis, a hair grooming product containing alcohol, into a plastic ice cream container, placed some tissue in the container, ignited it, and threw the solution on Buster. The evidence showed that Vickers made between three to nine sloshes of the liquid on Buster and in Buster's cell.

Before this, Officer Marling, who was assigned to cover the pod area, had picked up the trash bag that Vickers had placed next to the pod door. Marling left the pod area to dispose of the trash bag and ten minutes later the fire alarm sounded. Alerted by the alarm, Marling returned to the pod area where he met three other prison workers, Captain Padilla, Sergeant Romines and Officer Vancura.

Although the pod was filled with thick smoke, Padilla and Vancura managed to pull Vickers, who was lying on the floor near the pod door, from the pod area. Outside the pod Padilla asked Vickers, "What happened?" and Vickers replied "I burned Buster." Padilla then asked Vickers if Buster was dead and Vickers stated, "He should be, he's on fire."

Padilla, Marling and Vancura then rescued inmate Smith and attempted to rescue inmate Mata. Due to the amount of smoke in the pod, they were unable to rescue Mata until airpacks arrived.

When Smith and Mata were removed from the pod, both were suffering severely from smoke inhalation. Smith was in a semiconscious state while Mata was unconscious. Evidence indicated that had they

been left in the smoke-filled pod much longer they would have died from smoke inhalation. After Mata and Smith were rescued, Buster was retrieved and pronounced dead.

From a jury verdict, judgment of guilt and sentence of death, defendant appeals.

## IV. TEMPORAL LOBE EPILEPSY

Defendant claims his conviction was unconstitutional because the trial court denied his request for further medical tests. Defendant argues that this violated his due process and equal protection rights.

Defendant relied on insanity as a defense and specifically that he had temporal lobe epilepsy. Dr. Bindelglas, a psychiatrist who testified for the defense, stated that there was a "definite probability" that defendant had temporal lobe epilepsy. However, Dr. Bindelglas testified that no one could positively conclude whether defendant had the physical condition unless defendant underwent further testing and observation. Dr. Bindelglas stated that no facilities in Arizona were suitable for this type of testing. Instead the defendant would have to be transported to an out-of-state facility and undergo observation for four to six weeks.

The trial court appointed Dr. William Masland, a neurologist, to examine the defendant to determine if he needed further testing. The trial court stated in its minute entry that if Dr. Masland felt further tests were necessary, additional arrangements would be made. After reviewing the defendant's medical records and examining the defendant, Dr. Masland concluded that further diagnostic testing would be "totally superfluous." Two other doctors (Maier I. Tuchler and John S. LaWall) testified that defendant did not have temporal lobe epilepsy. The court denied defendant's motion for further medical tests.

At trial Dr. Tuchler testified:

Q. Could that series of acts been the result of any kind of epileptic seizure or postictal seizure or anything of that sort?

A. I have an opinion. This is an act that was planned that's characteristic of the person that was impulsive indeed, but not the product of a seizure....

\* \* \* \* \* \*

Now this is not a simple action. This is a complicated volitional act. It does not appear to be the kind of an act that would occur in an individual with a temporal lobe seizure disorder.

■ Defendant, relying on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed. 2d 53 (1985), contends that the trial court violated his due process rights by not allowing him the full opportunity to prove his insanity defense. In *Ake*, the Supreme Court stated:

[W]hen a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one.

*Id.* at 74, 105 S.Ct. at 1091–92.

The Supreme Court also delineated three factors to be considered in determining whether a state must provide the assistance of a psychiatrist:

Three factors are relevant to this determination. The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Id.* at 77, 105 S.Ct. at 1093. These factors may also be analyzed to determine if the state should provide the defendant with further testing.

The first factor is the effect on the private interest if further testing is not provided. *Id.* Obviously, there is a heavy interest involved when a person's life and liberty are at stake. In the instant case, the court provided defendant with one expert (Dr. Bindelglas) and the question is whether the court must provide more.

The second factor to consider is the effect on the state's interest. *Id.* In this case, ordering out-of-state testing would have been expensive and a burdensome security problem. The additional testing would have entailed transporting defendant out of state and keeping him under observation and under security for four to six weeks.

The third factor the Court considered in *Ake* was the probable value of the additional testing and "the risk of an erroneous deprivation of the affected interest" if the testing is not provided. *Id.* In this case no indication exists that further testing would have helped defendant prove his insanity defense. The risk of error is minimal given the fact that three expert witnesses testified that the defendant could not have been suffering from a seizure at the time of the killing. Although we can envision fact situations in which the state could be required to shoulder the burden of additional testing, in this case it is not necessary in light of the questionable value to the defendant. We find that the trial court did not err in denying defense counsel's motion for further diagnostic testing.

■ Defendant also claims that the denial of further medical tests violated the equal protection clause. We disagree. The United States Supreme Court has never held that equal protection requires the state to provide to an indigent defendant everything a wealthy person might be able to afford. *Ross v. Moffitt*, 417 U.S. 600, 612, 94 S.Ct. 2437, 2444–45, 41 L.Ed.2d 341 (1974) (states are not required to purchase for the indigent defendant all the assistance that his wealthier counterpart might buy); *see San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 24, 93 S.Ct. 1278, 1291, 36 L.Ed.2d 16 (1973). We find no error.

## V. IMPEACHMENT OF POTENTIAL WITNESSES

■ At trial defendant planned on calling two prison inmates to testify on his behalf. The two inmates were both members of the Aryan Brotherhood, an organization that allegedly has a creed requiring its members to commit perjury, if necessary, to protect another member of the organization. Defendant claims the trial court erred in a pretrial ruling that the prosecutor could impeach the witnesses with evidence of their membership in the organization. Defendant claims that because of this ruling defense counsel did not call the two inmates to testify on defendant's behalf.

Because the defendant made no offer of proof concerning the substance of the inmates' proposed testimony, we have no way of knowing whether they possessed admissible and relevant evidence. In the absence of an offer of proof, we would not ordinarily consider the issue on appeal. *State v. Bay*, 150 Ariz. 112, 115, 722 P.2d 280, 283 (1986). However, in view of the nature of this particular case and the sentence imposed, we have decided to consider the merits of the trial court's pretrial ruling concerning the use of impeachment testimony.

We believe that the trial court's ruling was correct. Questioning the witnesses about their obligation and belief would have been proper impeachment. As the United States Supreme Court noted in another case involving the Aryan Brotherhood:

> We hold that the evidence showing Mills' and respondent's membership in the prison gang was sufficiently probative of Mills' possible bias towards respondent to warrant its admission into evidence. Thus it was within the District Court's discretion to admit Ehle's testimony, and the Court of Appeals was wrong in concluding otherwise.

*United States v. Abel*, 469 U.S. 45, 49, 105 S.Ct. 465, 467, 83 L.Ed.2d 450 (1984). We find no error.

## VI. VOLUNTARINESS OF STATEMENTS

The defendant claims that the trial judge erroneously admitted into evidence three sets of statements Vickers made after the fire. First, Vickers' statements to Captain Padilla immediately after he was pulled

from the smoke-filled pod; second, defendant's statements to Officer Vancura while Vancura was standing guard over him; and third, defendant's statements in the squad room to Officer Morgan.

The trial court held a voluntariness hearing and determined that Vickers made all three sets of statements voluntarily, intelligently and knowingly. We will not upset the trial court's determination "absent clear and manifest error." *State v. Hein,* 138 Ariz. 360, 365, 674 P.2d 1358, 1363 (1983) (citing *State v. Arnett,* 119 Ariz. 38, 42, 579 P.2d 542, 546 (1978)).

A. Statements Immediately After the Fire

■ After defendant was pulled from the smoke-filled pod, Captain Padilla asked him what happened and defendant said he "burned Buster." Asked if Buster was dead, defendant answered, "He should be, he's on fire." Defendant claims the trial judge should not have admitted these statements into evidence because defendant was not read his *Miranda* rights. We disagree for two reasons. First, *Miranda* warnings are required to be given only when a defendant is in custody and under interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). We do not believe Vickers was under interrogation or in custody when Padilla asked him what happened.

As the United States Court of Appeals for the Ninth Circuit has stated:

The question in this case is unique because Cervantes was residing in jail when the questioning occured. Cervantes relies on *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), for the proposition that any interrogation during prison confinement constitutes custodial interrogation requiring *Miranda* warnings. We do not read *Mathis* so broadly....

* * * * * *

Adoption of Cervantes' contention would not only be inconsistent with *Miranda* but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart. We cannot believe

the Supreme Court intended such a result. Thus, while *Mathis* may have narrowed the range of possible situations in which on-the-scene questioning may take place in a prison, we find in *Mathis* no express intent to eliminate such questioning entirely merely by virtue of the interviewee's prisoner status.

*Cervantes v. Walker,* 589 F.2d 424, 427 (9th Cir.1978). *See also State v. Cruz-Mata,* 138 Ariz. 370, 372–73, 674 P.2d 1368, 1370–72 (1983).

Nor was defendant under interrogation. Under *Miranda,* the term "interrogation" refers to questioning which the "police should know [is] reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed. 2d 297 (1980). There is no evidence indicating that Padilla could have known that his question, "What happened?" would elicit an incriminating response from Vickers. Nor is there any evidence indicating that Vickers was suspected of committing a crime when Padilla asked him what happened. Both Padilla and Vancura testified that they had no idea what had happened. They had no reason to believe, at that point, that a crime had been committed. Vickers was not under interrogation, and Padilla was not required to read Vickers the *Miranda* warnings.

Second, even if Vickers was under custodial interrogation the statements are, nevertheless, admissible under the public safety exception recognized in *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984).

In *Quarles,* a woman told police officers that she had been raped by a man who had just walked into a certain supermarket with a gun. The police officers apprehended the defendant in the specified supermarket, frisked him and discovered the defendant was wearing a shoulder holster but was not carrying a gun. The police officer asked the defendant where the gun was and the defendant stated, "the gun is over there." *Quarles,* 467 U.S. at 652, 104 S.Ct. at 2629. The Supreme Court held that *Miranda* need not "be applied in

all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Quarles*, 467 U.S. at 656, 104 S.Ct. at 2632. The Court stated that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Quarles*, 467 U.S. at 657, 104 S.Ct. at 2632.

In the instant case, Padilla testified that he asked Vickers what happened and whether Buster was dead in order to make a strategic plan of rescuing the other inmates. Padilla testified that, based on Vickers' statements, they decided it would be best to rescue Smith and Mata first before attempting to save Buster. We believe defendant's statements fall under the public safety exception to *Miranda*.

**B. Initiated Conversation**

■ Defendant made a second set of statements to Officer Vancura while Vancura was standing guard over him. Vickers told Vancura that he had "burned the old man up" because Buster had deceived him about his physical incapacity and had made a sexual comment about Vickers' niece. Vancura testified that he did not initiate any conversation with the defendant; rather, Vickers made these statements without being asked anything by Vancura.

Vickers was not under interrogation at this point. Vancura was just watching the defendant until an investigating officer arrived. The *Miranda* warnings did not have to be given and the statements were admissible. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").

**C. Physical Condition Precluding Defendant From Waiving His Rights**

■ The third set of statements Vickers made was when he spoke to Officer Morgan, the investigating officer. Morgan read Vickers his *Miranda* rights which Vickers waived. Defendant now claims that, because he was still suffering from smoke inhalation, his physical condition made it impossible to voluntarily, intelligently and knowingly waive his rights. In support of this argument defendant relies on *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). In *Mincey*, the Supreme Court held that, because of the defendant's physical condition, his statements made to police officers were not voluntarily, intelligently and knowingly made and thus could not be used against him. *Mincey*, 437 U.S. at 399, 98 S.Ct. at 2418. However, in *Mincey*, police officers interrogated the defendant while he was in a hospital intensive care unit and was "depressed almost to the point of coma...." *Mincey*, 437 U.S. at 398, 98 S.Ct. at 2416. Mincey was "evidently confused and unable to think clearly" and was "encumbered by tubes, needles, and breathing apparatus." *Mincey*, 437 at 398–99, 98 S.Ct. at 2417.

Vickers' condition when he was questioned by Morgan was not as serious as Mincey's. Morgan testified that when he questioned the defendant, Vickers appeared to be fine, and talked coherently and rationally. Officer Vancura, who was present when Morgan questioned the defendant, testified that Vickers was breathing and speaking normally. Because Vickers' physical condition was clearly distinguishable from Mincey's condition, *Mincey* does not apply. *See also United States v. Martin*, 781 F.2d 671 (9th Cir.1985) (defendant's statements considered voluntary even though made while he was in the hospital, under the influence of Demerol (a pain killer), and was only "relatively coherent" during questioning).

We believe Vickers' statements were " 'the product of a rational intellect and a free will.' " *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960)). The trial court did not err in admitting defendant's statements.

## VII. PRIOR BAD ACTS

■ Defendant claims the trial court erred in admitting evidence of defendant's other bad acts. At trial Dr. Bindelglas repeatedly referred to "episodic violence" and "random behavior" in Vickers' background. Dr. Bindelglas linked this to the possibility that defendant had temporal lobe epilepsy, which was the core of defendant's insanity defense. To refute Dr. Bindelglas' testimony, the state proffered evidence of three bad acts committed by the defendant which showed that defendant's violent acts were neither random nor senseless, but were calculated and self-promoting and thus were not linked to temporal lobe epilepsy.

The state first introduced evidence that in 1974 or 1975 defendant attacked a farmer. The evidence showed that the reason defendant attacked the farmer was because he had caught defendant burglarizing a farm. The state next introduced evidence that defendant attacked his cellmate in 1978. Evidence indicated that defendant had done this because he was afraid his cellmate was going to attack him, and defendant attacked as a preemptive strike out of fear. Finally, the state introduced evidence that defendant attacked Thomas Coco in 1983. The state showed that defendant attacked Coco because Coco had agreed to testify against defendant in this matter.

■ Normally evidence of prior bad acts is not admissible to show that the defendant is a bad person or has a propensity for committing crimes. *State v. Amarillas,* 141 Ariz. 620, 622, 688 P.2d 628, 630 (1984). However, when a defendant asserts insanity as a defense " 'any and all conduct of the person is admissible in evidence.' " *United States v. Smith,* 507 F.2d 710, 711 (4th Cir.1974) (quoting 1 Wigmore, *Evidence* § 228 (1940)). When insanity is at issue, evidence of prior bad acts is admissible if relevant, Ariz.R.Evid. 402, and if the probative value of the evidence is not substantially outweighed by unfair prejudice, Ariz.R.Evid. 403. *See State v. Amarillas,* 141 Ariz. 620, 623, 688 P.2d 628, 631 (1984).

In the instant case, defendant's bad acts were relevant because they tended to show that any violence committed by the defendant was deliberate, not random, and thus not caused by temporal lobe epilepsy.

Defendant claims, however, that the probative value of these acts was substantially outweighed by unfair prejudice. Admittedly, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." Ariz.R.Evid. 403.

In this case, the trial court was careful to prevent undue prejudice. The court only allowed the state to show that Vickers had attacked the farmer, not that he had shot at him. Also, the court only permitted the prosecutor to mention that defendant had attacked his cellmate, not that he had killed him. Nor was the cellmate's name (Frank Ponciano) mentioned for fear the jurors might recognize the name and recall defendant's previous, highly publicized murder trial. Nor did the state place into evidence defendant's statements that he would have killed Coco if he could have.

The weighing and balancing of the probative value against the prejudice of evidence is "within the discretion of the trial court and will not be disturbed on appeal unless it has been clearly abused." *State v. Williams,* 133 Ariz. 220, 230, 650 P.2d 1202, 1212 (1982). The trial court sufficiently alleviated any unfair prejudice and did not abuse its discretion in admitting defendant's bad acts. We find no error.

## VIII. PREMEDITATION

■ Defendant claims the state did not prove premeditation beyond a reasonable doubt. *State v. Kreps,* 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985); *State v. White,* 144 Ariz. 245, 246, 697 P.2d 328, 329 (1985).

Premeditation is defined as follows:

1. "Premeditation" means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is

the instant effect of a sudden quarrel or heat of passion.

A.R.S. § 13–1101.

In order to carry its burden, the state must prove that the defendant "made a decision to kill prior to the act of killing, that 'a plan to murder was formed after the matter had been made a subject of deliberation and reflection.'" *State v. Lacquey*, 117 Ariz. 231, 234, 571 P.2d 1027, 1030 (1977) (quoting *Macias v. State*, 36 Ariz. 140, 149, 283 P. 711, 715 (1929)). The standard of review upon appeal is "whether there was sufficient evidence that a rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Tison*, 129 Ariz. 546, 552, 633 P.2d 355, 361 (1981) (citing *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979)), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982).

Defendant claims the evidence did not show that he had enough time to premeditate. Defendant bases this argument on the fact that when Officer Marling left the pod area to dispose of the trash ten minutes before the fire alarm sounded, defendant did not appear agitated. This was not required. Premeditation may be as "instantaneous as successive thoughts of the mind...." *Kreps*, 146 Ariz. at 449, 706 P.2d at 1216. The facts show that sometime after Buster made the obscene statement, Vickers went back to his cell, poured five bottles of Vitalis into a plastic container, put tissue into the container and ignited it. This is strong evidence of premeditation.

Defendant also claims the evidence only proves that he intended to burn Buster, not kill him. Defendant bases this argument on the fact that when Vickers was pulled from the pod and asked what happened he replied, "I burned Buster" rather than stating that he had "killed Buster." However, this ignores the fact that when Padilla asked if Buster was dead, Vickers exclaimed, "He should be, he's on fire." We

believe the evidence shows the defendant intended to kill Buster or at least knew that he would kill Buster when he threw the firebomb on him. We find no error.

## IX. PROOF OF SANITY

Defendant claims the state did not meet its burden of proving that he was sane beyond a reasonable doubt at the time he burned Buster. A defendant is presumed to be sane. *State v. Berndt*, 138 Ariz. 41, 45, 672 P.2d 1311, 1315 (1983). However, under the statute in effect at the time, once the defendant raises the issue of insanity, the burden is on the state to prove the defendant was sane beyond a reasonable doubt.[1] *State v. McShine*, 131 Ariz. 485, 487, 642 P.2d 482, 484 (App.1982).

The state produced three expert witnesses each of whom testified that defendant was sane at the time of the offense. Also, the jury heard the statements defendant made directly after the killing which showed that defendant knew exactly what he had done.

Evidence presented at trial indicated that defendant might suffer from temporal lobe epilepsy. Dr. Bindelglas testified that there is a "definite probability" that Vickers has temporal lobe epilepsy. However, Dr. Bindelglas admitted that a person who has temporal lobe epilepsy is not necessarily legally insane. Only when the person is having a seizure or is in a disassociative state would the person not know right from wrong.

Drs. Masland, Tuchler and LaWall each testified that defendant was legally sane when he committed the murder. All three experts also testified that, given the complexity of the volitional acts taken in the commission of the killing, defendant could not have been having a seizure at the time he killed Buster.

We believe reasonable minds could conclude that defendant was sane beyond a

---

1. The legislature has since shifted the burden of proof to the defendant. A.R.S. § 13–502(B). However, the old law applies in this case because the defendant committed the offense before A.R.S. § 13–502(B) went into effect. *State v. Clabourne*, 142 Ariz. 335, 345, 690 P.2d 54, 64 (1984); *State v. Coconino County Superior Court Division II*, 139 Ariz. 422, 426–27, 678 P.2d 1386, 1390–91 (1984).

reasonable doubt. The state met its burden of proof and, because substantial evidence supported the jury's verdict, we are bound by that verdict. *State v. Berndt*, 138 Ariz. 41, 46, 672 P.2d 1311, 1316 (1983); *State v. McShine*, 131 Ariz. 485, 487, 642 P.2d 482, 484 (App.1982).

## X. FAILURE TO GIVE MANSLAUGHTER INSTRUCTION

■ Defendant claims it was error for the trial court not to instruct the jury on manslaughter. The court must instruct the jury on every lesser-included offense to the one charged if the evidence supports the giving of the instruction. Ariz.R. Crim.P. 23.3, 17 A.R.S. *See State v. Celaya*, 135 Ariz. 248, 251, 660 P.2d 849, 852 (1983) (citing *State v. Dugan*, 125 Ariz. 194, 195, 608 P.2d 771, 772 (1980)). Our manslaughter statute states:

A person commits manslaughter by:

1. Recklessly causing the death of another person; or

2. Committing second degree murder ... upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim....

A.R.S. § 13–1103.

### A. Reckless Murder

"Recklessly" is defined as follows:

"Recklessly" means ... that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

A.R.S. § 13–105(6)(c).

The record does not support a reckless manslaughter instruction. Defendant did not recklessly disregard the risk to Buster. Defendant created the risk. Defendant had to go to his cell, pour several bottles of Vitalis into a container, add tissue paper, ignite the container and throw it on the victim. Considering all of these preparatory and deliberate steps, Buster's death cannot be considered to have been caused recklessly. We find no error.

### B. Heat of Passion

■ A defendant is entitled to a manslaughter instruction if the evidence establishes that the homicide was committed in the heat of passion aroused by adequate provocation. *State v. Doss*, 116 Ariz. 156, 162, 568 P.2d 1054, 1060 (1977) (citing *State v. Johnson*, 112 Ariz. 17, 536 P.2d 1035 (1975)). Defendant claims his actions were done in the heat of passion resulting from adequate provocation by the victim. We disagree.

The evidence indicates that defendant murdered Buster because Buster made an obscene statement concerning defendant's niece. However, words alone are not adequate provocation to justify reducing an intentional killing to manslaughter. *Doss*, 116 Ariz. at 162, 568 P.2d at 1060.

[I]t is the general rule that mere language, however aggravated, abusive, opprobrious or indecent, whether directed at the slayer personally or spoken concerning his female relative, is not sufficient provocation to reduce a killing ... from premeditated murder to manslaughter.

40 Am.Jur.2d *Homicide* § 64, *quoted in State v. Doss*, 116 Ariz. 156, 162, 568 P.2d 1054, 1060 (1977). The evidence did not support a manslaughter instruction.

### C. Harmless Error

■ Even if the trial court erred by failing to give a manslaughter instruction, the error was harmless because the jury, though instructed on the lesser-included offense of second degree murder, still convicted defendant of first degree murder. "[B]y finding defendant guilty of the highest offense, to the exclusion of the immediately lesser-included offense, second degree murder, the jury necessarily rejected all other lesser-included offenses. The error, if indeed it was error, of not instructing as to such offenses was harmless." *State v. White*, 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985); *see also State v. Nowlin*, 244 N.W.2d 591, 596 (Iowa 1976) ("Where

both first and second-degree murder verdicts are submitted and a first-degree murder conviction is returned there is no prejudice for failure to instruct on manslaughter.").

## XI. DEATH PENALTY ISSUES [2]

### A. Constitutionality

Defendant claims the Arizona death penalty statute, A.R.S. § 13–703, is unconstitutional on its face for the following reasons: 1) the jury takes no part in the sentencing determination; 2) the death penalty statute is mandatory and not individualized; 3) the statute places the burden of proving mitigating circumstances on the defendant; and, 4) the "heinous, cruel or depraved" aggravating circumstance is unconstitutionally vague on its face.

#### 1. *Jury Input*

[■■■■] We have previously rejected defendant's claim that the Arizona death penalty is unconstitutional because the jury does not participate in sentencing, and we do so again. *State v. Bracy,* 145 Ariz. 520, 536, 703 P.2d 464, 480 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986); *State v. Poland,* 144 Ariz. 388, 403, 698 P.2d 183, 188 (1985), *aff'd,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986). The United States Supreme Court has recognized that "jury sentencing in a capital case can perform an important societal function." *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913 (1976) (citing *Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775 n. 15, 20 L.Ed.2d 776 (1968)). However, the Court has "never suggested that jury sentencing is constitutionally required." *Proffitt,* 428 U.S. at 252, 96 S.Ct. at 2966. *See also McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 1773 n. 25, 95 L.Ed.2d 262 (1987); *State v. Harding,* 137 Ariz. 278, 293, 670 P.2d 383, 398 (1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). We find no error.

#### 2. *Mandatory Death Penalty*

[17] A.R.S. § 13–703(E) states:

[T]he court shall take into account the aggravating and mitigating circumstances ... and *shall impose* a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection F of this section and that there are no mitigating circumstances sufficiently substantial to call for leniency.

(Emphasis added). Defendant argues that because of the words "shall impose" the statute prohibits individualized sentencing and operates as a mandatory death penalty statute in violation of *Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). We do not agree.

In *Roberts,* a Louisiana statute mandated the death penalty for any person convicted

---

**2.** We are aware of the decision of the United States Court of Appeals for the Ninth Circuit in *Adamson v. Ricketts,* 865 F.2d 1011, (9th Cir. 1988), which holds that Arizona's death penalty statute is unconstitutional. The Ninth Circuit opinion invalidates our death penalty scheme on some of the same grounds Vickers raises here. We note that the grounds on which the Ninth Circuit rested its constitutional holdings are grounds on which different courts may reasonably hold differing views of what the Constitution requires. Until the United States Supreme Court instructs us that our interpretations are incorrect, we will continue to apply them.

The most troubling portion of the Ninth Circuit opinion is that part which concludes that this court has failed in its duty to prevent the arbitrary and capricious application of A.R.S. § 13–703(F)(6), the "especially heinous, cruel, or depraved" aggravating circumstance. *Adam-son* at 1029–1039. We have attempted to give a narrowing interpretation to these admittedly broad subjective terms. *See State v. Gretzler,* 135 Ariz. 42, 50–53, 659 P.2d 1, 9–12, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We believe we have successfully narrowed § 13–703(F)(6), and that we have applied that narrow interpretation consistently. But here, too, reasonable jurists may differ. *See Adamson,* at 1055–1059 (Brunetti, J., dissenting) (arguing that the Arizona Supreme Court has sufficiently narrowed and consistently applied the heinous, cruel, or depraved aggravating factors). But, as stated above, the United States Supreme Court will have the opportunity to have the final word on the constitutionality of our interpretation and application of § 13–703(F)(6). If the United States Supreme Court holds that section unconstitutional on its face or as applied, or otherwise invalid, we will comply with the Court's opinion.

of the first degree murder of a police officer, regardless of the defendant's character and record or the circumstances of the particular offense. *Roberts,* 431 U.S. at 634, 97 S.Ct. at 1994. The Court held it was unconstitutional to presume that no mitigating circumstances sufficient to call for leniency existed whenever the victim was a police officer. *Id.* at 636–37, 97 S.Ct. at 1995.

Our statute is different from the Louisiana statute because it requires the trial judge to consider the evidence presented in mitigation including the defendant's character and record, and the circumstances of the offense. The death penalty is mandatory only after the judge has considered the evidence presented in mitigation and determined that no mitigating factors sufficient to call for leniency exist. We do not believe the Arizona death penalty statute constitutes an improper mandatory sentencing procedure. *State v. Smith,* 146 Ariz. 491, 500, 707 P.2d 289, 298 (1985); *State v. Jordan,* 137 Ariz. 504, 508, 672 P.2d 169, 173 (1983).

### 3. *Burden of Proving Mitigating Circumstances*

■ Defendant also claims that the statute is unconstitutional on its face because it places the burden of proving mitigating circumstances on the defendant. We again reject this argument and repeat what we have previously stated:

> Once the defendant has been found guilty beyond a reasonable doubt, due process is not offended by requiring the defendant to establish mitigating circumstances. As we stated in *State v. Smith,* 125 Ariz. 412, 416, 610 P.2d 46, 50 (1980), "[f]acts which would tend to show mitigation are peculiarly within the knowledge of a defendant."

*State v. Richmond,* 136 Ariz. 312, 316, 666 P.2d 57, 61, *cert. denied,* 464 U.S. 986, 104 S.Ct. 435 (1983); *see also State v. Bracy,* 145 Ariz. 520, 536, 703 P.2d 464, 480 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986).

### 4. *Heinous, Cruel or Depraved*

■ Finally, defendant argues that Arizona's "heinous, cruel or depraved" aggravating circumstance is unconstitutionally vague. The United States Supreme Court recently held Oklahoma's aggravating circumstance of "especially heinous, atrocious or cruel" to be void for vagueness. *Maynard v. Cartwright,* — U.S. —, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). One reason for doing so was because the statute failed to adequately inform the jury of what they must find to impose the death penalty and thus left the jury and appellate courts with unfettered discretion. *Maynard,* — U.S. at —, 108 S.Ct. at 1859. We note that in Arizona, the judge and not the jury determines the death penalty.

We do not believe our statute falls under *Maynard.* We believe our statute falls under *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In *Proffitt,* the Supreme Court considered Florida's "especially heinous, atrocious, and cruel" aggravating circumstance and held that the terms, as construed by the Florida Supreme Court, were not unconstitutionally vague. The Court stated, "We cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." *Proffitt,* 428 U.S. at 255–56, 96 S.Ct. at 2968.

We believe we have sufficiently defined the terms "heinous, cruel and depraved" to prevent the sentencing judge from having unfettered discretion. These terms as applied by the Arizona courts are not void for vagueness. *State v. Smith,* 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985); *State v. Gretzler,* 135 Ariz. 42, 51, 659 P.2d 1, 10, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *State v. Ortiz,* 131 Ariz. 195, 206, 639 P.2d 1020, 1031 (1981), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982).

### B. Independent Review

We have the duty to independently review the existence of aggravating or mitigating circumstances and to independently determine the propriety of the sentence.

*State v. Gretzler*, 135 Ariz. 42, 57, 659 P.2d 1, 16, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

### 1. *Aggravating Circumstances*

 The trial judge found the existence of five aggravating circumstances. First, that the defendant was previously convicted of another offense for which, under Arizona law, life imprisonment or death was imposable. To support this aggravating circumstance, the court found the following:

A. On July the 24th, 1978, the defendant, Robert Wayne Vickers, was adjudged guilty in Pinal County Superior Court, Cause Number 7779, of the crime of assault with a deadly weapon while armed with a deadly weapon, a violation of Arizona Revised Statutes, Section 13–249(B), as amended.

The imposable sentence under the statute section in effect at that time was the minimum term of five years and a maximum term of life imprisonment in the State Prison.

B. On August the 13th, 1979, the defendant, Robert Wayne Vickers, was adjudged guilty in Pinal County Superior Court, Cause Number 8058, of the crime of murder in the first degree, in violation of A.R.S. 13–1105(A)(1), and was sentenced to death.

C. On July the 28th, 1980, the defendant, Robert Wayne Vickers, was adjudged guilty in Pinal County Superior Court, Cause Number 8471, of the crime of dangerous or deadly assault by a prisoner, a dangerous felony, in violation of A.R.S. 13–1206, and also received life imprisonment.

Incident B refers to Vickers' previous conviction of the first degree murder of his cellmate, Frank Ponciano. However, this conviction has been set aside and a new trial ordered. *See Vickers v. Ricketts*, 798 F.2d 369 (9th Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987). Therefore, this offense does not support the trial court's finding of this aggravating circumstance. Nevertheless, the two remaining offenses (A and C) are valid and were punishable under Arizona law by life imprisonment. Therefore, we find that this aggravating circumstance exists. *See State v. Smith*, 146 Ariz. 491, 707 P.2d 289 (1985) (elimination of some aggravating factors in the absence of mitigating circumstances does not mandate a remand to the trial court for resentencing).

The second aggravating circumstance the trial court found was that the defendant was previously convicted of a felony involving the use or threat of violence on another person. The trial court listed the same three incidents to support this aggravating circumstance. Again, the second incident can no longer support this aggravating circumstance because this murder conviction has been reversed. However, because of the validity of the other two incidents, this aggravating circumstance still stands.

 The trial court found as a third aggravating circumstance that the defendant, in the commission of this offense, knowingly created a grave risk of death to another person in addition to the victim. We find that this aggravating circumstance exists. The evidence showed that two inmates' lives were endangered. When rescued, inmate Mata was unconscious and inmate Smith was semiconscious. The evidence showed that had they been left in the pod much longer, they would have died from smoke inhalation. The defendant knowingly created the condition that constituted a grave risk of death to Smith and Mata.

 The trial court also found that defendant committed the murder in an especially heinous, cruel and depraved manner. The trial court found the following:

The defendant, Robert Wayne Vickers, after having thrown inflammable liquid upon the physically disabled victim and igniting him, and while the victim was attempting to put out the flames, tossed another container of flammable liquid on the victim.

Evidence at the trial disclosed Holsinger suffered great pain. Mr. Holsinger received multiple sloshes of burning

flammable liquid over most of his body. These contact burns even included the normally protected areas under his arm. According to Fire Marshal David Dale's testimony, this indicated he received part of the attack while standing upright with his arms upraised in an apparent attempt to combat the fire raging around his head.

Burns covered virtually all of his body. He died from burns to his bronchial tubes and lungs.

Immediately afterward, when asked if Holsinger was dead, Vickers responded, "He ought to be. He's on fire."

Holsinger was completely helpless. He was a physically handicapped man locked in his cell. He had no way to escape and no defense.

Vickers had not been harmed by Holsinger and gained nothing by the crime. Vickers relished the crime, killed a completely helpless individual, and killed senselessly.

We believe the offense was especially heinous (*State v. Ortiz*, 131 Ariz. 195, 210, 639 P.2d 1020, 1035 (1981) (murder, in which defendant stabbed victims and then poured gasoline on or near the victims and ignited the gasoline, was "far more heinous and depraved than the norm of first degree murders"), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982)), and cruel (*State v. Harding*, 141 Ariz. 492, 501, 687 P.2d 1247, 1256, (1984) (murder, in which defendant bound and gagged the victim such that victim did not die instantaneously, but died slowly from asphyxiation, was clearly "committed in a cruel manner")), and depraved (*Ortiz, supra*).

The trial court also found that the defendant committed the offense while in the custody of the Department of Corrections. We also find that the record supports this aggravating circumstance.

### 2. *Mitigating Circumstances*

■ The trial court found no mitigating circumstances sufficient to call for leniency. Defendant argues that, because he was under 25 when he committed the offense, the trial court erred in not finding

his age to be a mitigating factor. Defendant was 23 years old at the time he committed the crime.

Although age may be considered a mitigating factor, A.R.S. § 13–703(G)(5), our statute does not prescribe what age is a mitigating factor. We have previously refused to hold age as a mitigating factor in cases where the defendant was younger than Vickers. *State v. Clabourne*, 142 Ariz. 335, 348, 690 P.2d 54, 67 (1984) (age was not a mitigating factor for defendant who was 20 years old); *State v. Gillies*, 142 Ariz. 564, 571, 691 P.2d 655, 662 (1984) (age was not a mitigating factor for defendant who was 20 years old), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). In light of defendant's prior criminal history, we agree with the trial court that defendant's age was not a mitigating factor substantial enough to call for leniency.

We have reviewed the record and do not believe there are any other mitigating circumstances sufficient to call for leniency.

### C. Proportionality Review

■ In addition to making an independent determination of the aggravating and mitigating circumstances, we must also determine if the sentence imposed is proportional to other death penalties imposed in Arizona and other jurisdictions. *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

We have considered other Arizona cases in which the death penalty was imposed and we do not believe defendant's sentence was excessive or disproportionate to those cases. *State v. Smith*, 131 Ariz. 29, 638 P.2d 696 (1981) (death penalty upheld when trial court found no mitigating circumstances and found aggravating circumstances of prior convictions punishable by life imprisonment, offense committed in an especially heinous, cruel or depraved manner and prior conviction involving violence); *State v. Mata*, 125 Ariz. 233, 609 P.2d 48 (death penalty upheld when no mitigating circumstances found and aggravating circumstances were prior conviction punisha-

ble by life imprisonment and heinous, cruel or depraved), *cert. denied*, 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980); *State v. Evans*, 124 Ariz. 526, 606 P.2d 16 (death penalty upheld when no mitigating circumstances found and aggravating circumstance of prior conviction involving violence was found), *cert. denied*, 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 119 (1980).

We have also reviewed cases from other jurisdictions in which the defendant murdered a fellow inmate and received the death penalty. *Murphy v. State*, 248 Ark. 794, 454 S.W.2d 302 (1970); *State v. Parkus*, 753 S.W.2d 881 (Mo.1988); *State v. Zeitvogel*, 707 S.W.2d 365 (Mo.1986); *State v. Guinan*, 665 S.W.2d 325 (Mo.1984). In *Murphy v. State*, the defendant stabbed a fellow inmate and his death sentence was affirmed by the Arkansas Supreme Court. In *State v. Zeitvogel*, the defendant, who strangled his cellmate with a double-stranded wire, was also given the death penalty. In that case the defendant had also participated in a previous killing of a fellow inmate as had Vickers. We do not believe defendant's death penalty was excessive or disproportionate to the penalties imposed in similar cases considering the crime and the defendant.

## XII. ANDERS

Defendant's attorney, in addition to the issues discussed above, raised additional "arguable issues" pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969). The defendant's attorney stated:

> [C]ounsel for Appellant has conscientiously reviewed the record for any fundamental or reversible error pertaining to this portion of Appellant's brief and has found none. Counsel for Appellant has set forth in this portion of the brief "arguable issues" which he has researched and has determined that the case law does not support any error. Therefore, counsel and Appellant request

that the Court search the entire record for error pertaining to the issues set forth below. A.R.S. Section 13–4035.
Appellant's Opening Brief at 41.

We have considered defendant's "arguable issues" and have examined the entire record for fundamental error pursuant to A.R.S. § 13–4035, *Anders, supra; Leon, supra.* We find no error.

## XIII. DISPOSITION

The defendant's conviction and death sentence are affirmed.

GORDON, C.J., FELDMAN, V.C.J., and MOELLER, J., concur.

HOLOHAN, J., participated in this matter but retired prior to the filing of this opinion.

CORCORAN, J., did not participate in the determination of this matter.