# IN THE TENNESSEE COURT OF CRIMINAL APPEALS

## AT NASHVILLE

### AUGUST 1997 SESSION

FILED

January 15, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9606-CR-00230 |
| | ) | |
| Appellee, | ) | DAVIDSON COUNTY |
| | ) | (No. 87-F-1682 Below) |
| VS. | ) | |
| | ) | The Honorable Ann Lacy Johns |
| DONALD RAY MIDDLEBROOKS, | ) | |
| | ) | (RESENTENCING - DEATH PENALTY) |
| Appellant. | ) | |

FOR APPELLANT:

Lionel R. Barrett, Jr.
Washington Square Two, Suite 418
222 Second Avenue North
Nashville, TN 37201

Richard McGee
601 Woodland Street
Nashville, TN 37206

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Kathy Morante
Deputy Attorney General
425 Fifth Avenue North
Cordell Hull Building, Second Floor
Nashville, TN 37243-0493

Victor S. Johnson III
District Attorney General

Roger D. Moore
Assistant District Attorney General

John C. Zimmerman
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN 37201-1649

OPINION FILED: _____

**SENTENCE OF DEATH AFFIRMED**

**CURWOOD WITT**
Judge

**O P I N I O N**

In this capital case, the appellant, Donald Ray Middlebrooks, was convicted by a jury in September 1989 of felony murder and sentenced to death by electrocution. The appellant's conviction was upheld by our supreme court; however, his sentence was reversed, and the case was remanded for a new sentencing hearing. See State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), cert. dismissed, 510 U.S. 805, 114 S.Ct. 651, (1993).

At a new sentencing hearing held upon remand, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. See Tenn. Code Ann. § 39-2-203(I)(5)(1982) (repealed 1989). The jury found there were no mitigating circumstances sufficiently substantial to outweigh this aggravating circumstance and sentenced the appellant to death by electrocution.

In this appeal, the appellant raises issues regarding alleged errors occurring during the resentencing hearing and challenging the constitutionality of the death penalty statutes. The Court having carefully considered the appellant's contentions, we find that none has merit. Accordingly, we affirm the appellant's sentence of death.

## I. BACKGROUND

The victim's friend, Shannon Stewart, who was twelve years old at the time, met the appellant on the Monday before the victim disappeared. The appellant called himself "Debow." The woman with the appellant, Tammy Middlebrooks, was introduced as "Debowa." The two were selling junk at a flea market in a vacant lot on Gallatin Road. When Stewart and the victim saw the appellant and Tammy looking through a dumpster on Sunday morning, April 26, 1987, Stewart introduced them to the victim.

Around 4:30 or 5:00 p.m. on that day, the victim, Kerrick Majors, walked with

1

his older brother, Kelly Vaden, to a friend's house to shoot basketball. Around 7:00 p.m., Vaden and the victim were walking home when one of Vaden's friends drove by and asked him to go riding. The victim said that he was going back to play more basketball.

Later that evening, Stewart and the victim, along with some other friends, went to the vacant lot where there was a table with some items set out on it. Stewart was the last to get there because he was stopped by traffic while trying to cross Gallatin Road. The woman who identified herself as Debowa shouted "Hey, ya'll niggers leave our stuff alone." The appellant and Roger Brewington, who was selling junk with the appellant and Tammy Middlebrooks, started chasing the boys. Two of the boys managed to run ahead of the others. The three slower boys were Stewart, the victim, and Antonio Watson. Stewart saw Brewington grab the victim in a head lock, and the victim said "Hey man, you know me." The appellant ran up and said, "Shut up, nigger." He then smacked the victim. Stewart and Watson ran away. Later they met up with the other boys and saw the appellant walking around like he was looking for them, but they never found the victim.

Sometime after 9:00 p.m., three boys came to the home where the victim lived with Vaden and his mother, Deborah Majors. The boys told Majors that a white man had grabbed and slapped the victim on Gallatin Road. When Vaden then returned home around 10:00 p.m., Majors called the police, who then came to the house. Vaden went out looking for the victim's friends to get information, but he was unsuccessful. The police told Majors that the victim would probably be brought home for being out after curfew. If not, the police instructed Majors to go to the Juvenile Department in the morning.

The next morning, Majors reported her son missing, and she and the family continued to look for the victim. Vaden found one of the boys, Anthony Covington, who was with the victim when he was abducted. They, along with Majors and her father, went to the vacant lot on Gallatin Road where Covington had last seen the victim. Covington told them about a pathway through a wooded area behind the YMCA. Vaden and Covington walked up the path which came out at some railroad tracks, but they did not find

2

anything.  As Vaden was walking back, he noticed a foam mattress and saw some hair underneath it.  When he raised the mattress, he saw the victim lying there.

Sergeant Robert Moore was in charge of the investigation into the victim's murder.  In the area surrounding the victim's body, he found a jacket and white tennis shoes which were identified as belonging to the victim.  Two beer cans were also located nearby.  The victim's body was in a drainage ditch covered by a large piece of foam.  A pair of blue shorts were lying beside his head.  The victim was completely nude.  A woven belt was wound tightly around his left wrist.  Sergeant Moore also observed a large laceration across the right wrist.  Above the victim's left eye was a gash, and it was bloody and swollen.  There were places about the nose where skin was missing, and it was burned.  The victim's lips were swollen, and there was bleeding inside the mouth, with lacerations inside the mouth and around the lips.  The nose was also bloody and red.  Two lacerations were made by a sharp instrument that went in an "X" shape across the victim's chest.  There were also two deep stab wounds into the body a couple of inches apart.  The victim's testicles were swollen, and there was a large amount of blood on the legs.  Bruises, scrapes, abrasions, and burns could be observed all over the victim's body.  A t-shirt was tied in a hard knot around the victim's throat.  Blood on the t-shirt, which was beginning to coagulate at the time Sergeant Moore investigated the scene, was consistent with blood coming from the mouth.  The t-shirt was soaked in urine and there were streams of urine on top of the blood on the victim's body.  Beside the victim's head was a stick with blood on the end of it.  Sergeant Moore did not find any evidence of drug use at the scene of the murder.

Later that day, Sergeant Moore was notified that a person would meet him at a donut shop with information about the person or persons who murdered the victim. When Sergeant Moore arrived, Roger Brewington told him that he should be looking for Donald and Tammy Middlebrooks.  Based on the information Brewington was giving him and because Brewington matched descriptions given of a third suspect, Sergeant Moore determined  that Brewington was probably involved in the murder.  Brewington showed

3

Sergeant Moore the murder weapon, a lock-blade knife with brass knuckles, which was hidden in a planter in front of the donut shop.

Subsequently, Sergeant Moore interviewed Brewington at the police station and obtained an arrest warrant for Donald and Tammy Middlebrooks. Brewington, although six feet tall and approximately 170-175 pounds, was only sixteen years old, so he was transported to juvenile court and charged with homicide.[1]

A search of a wooded area near Gallatin Road resulted in finding a small shack where the appellant and Tammy Middlebrooks were living. Officer Allen Herald, with the canine division, opened the door and saw the two subjects lying on a mat. He ordered the two out of the shack, and Tammy Middlebrooks jumped up and started coming towards Officer Herald, whose K-9 partner grabbed her. Sergeant Moore was then able to seize Tammy Middlebrooks by the arm and pull her out. When the appellant did not respond to the commands, Officer Herald sent his K-9 partner in to apprehend him. A kitchen knife and a potato were laying next to the appellant. Both the appellant and Tammy Middlebrooks sustained dog bites and had to be taken to the hospital for treatment. While at the hospital, after being advised of his rights, the appellant told Sergeant Moore that he stabbed the victim twice to put an end to the torture.

At 12:30 p.m. that day, the appellant gave a lengthy video-taped statement at the police station about his involvement in the victim's death. The appellant admitted participating in the beating and mistreatment of the victim but described his role as minor and depicted Brewington as the primary perpetrator of the offense. According to the appellant, around dusk, five or six "colored boys" came by their table where they were selling junk. The boys started breaking a "bunch of stuff," so the appellant and Brewington chased them. Brewington caught one of the boys in a head lock. After the victim was

---

[1]Brewington was eventually tried an as adult and convicted of first-degree murder, aggravated kidnapping, and armed robbery, for which he was sentenced to consecutive sentences of life, 40 years, and 35 years, respectively. See State v. Brewington, No. 89-232-III (Tenn. Crim. App., at Nashville, June 20, 1990), perm. app. denied, (Tenn. Oct. 1, 1990). Tammy pled guilty to first-degree murder and was sentenced to life imprisonment.

caught, the appellant said Brewington suggested they "have some fun," and the three of them took the victim back into the woods. The victim's hands were tied, and Brewington slapped him, beat him with brass knuckles, hit him with a stick, and urinated into his mouth, making him swallow. Any time the victim would flinch, Brewington would hit him again. When the victim started crying and begging, saying "all I want to do is go to school and get my education," Brewington responded "f_ you nigger" and hit him some more.

At one point, the appellant and Brewington left Tammy Middlebrooks with the victim while they went out looking for the other boys. The appellant did not know what would have happened if they had found the others.

The appellant admitted striking the victim with his open hand and on the leg with a switch. Appellant said that Tammy slapped the victim and burned his nose with a cigarette lighter as Brewington urged her on. Brewington hit the victim's testicles with a stick, threatened to cut "it" open, stuck a stick up the victim's anus, hit him some more with the brass knuckles, wiped the victim's blood on himself, beat the victim's mouth and tongue with a stick, dropped the knife on him, gagged him, and slashed his wrist. While dropping the knife, Brewington told the victim he was taking him back to the days of "Roots."

Finally, when the appellant asked Brewington to stop because the victim's crying and pleading were getting on his nerves, Brewington gave the victim "the kiss of death" on the forehead. He also told the victim that he was in the mafia and the "KKK." Brewington then covered the victim's face with his clothes, handed the knife to the appellant, and told him to stab the victim. According to the defendant's statement, when he refused, Brewington stabbed the victim. The appellant then reluctantly stabbed the victim "to prove to Roger that I guess I was cooler" and to put the victim out of his misery. The appellant admitted that in his previous statement at the hospital, he told police that he had stabbed the victim twice. The appellant said he did not stop Brewington from "putting the boy through hell" sooner because he was afraid of Brewington and because Brewington had a knife. When asked why he did not stop it when Brewington gave him the

knife, the appellant said he was "scared to fight." The victim's ordeal began around 7:30 p.m. and ended around 11:00 p.m. with the stabbing. The appellant admitted that before beating and killing the victim, he and Brewington drank alcohol and smoked marijuana.

The appellant said that, the next morning, he covered the victim with a piece of Styrofoam. Then, he and Tammy met Brewington at the Holy Name Church for breakfast. Brewington commented on how much fun they had the night before, and he asked the appellant to help him go after an entire family. Brewington and the appellant sharpened their knifes on the railroad tracks, and Brewington showed the appellant the potential victims' house, but eventually, the appellant said he would not do it.

During the time the appellant was in custody, Sergeant Moore testified that he did not observe any signs that the appellant was under the influence of drugs or alcohol. The appellant's demeanor never changed, he did not appear delusional, nor did he give inappropriate responses.

The autopsy of the victim indicated that the victim was 4 feet, 11 inches tall, and weighed approximately 112 pounds. There was a large abrasion on the left side of the forehead, a contusion on the outside corner of the left eye, and a contusion on the left corner of the mouth. The two stab wounds to the anterior chest occurred within a short period of time. The murder weapon had been plunged a depth of 3.3 inches. There were superficial linear incisions on the anterior chest that crisscrossed each other. There was an incision of the right wrist that was 1.7 inches in length. The cause of death was a stab wound to the chest, which punctured the left lung and pulmonary artery. The victim died from blood loss. The superficial linear incisions on the victim's chest were made before the stab wounds. The minimum time from infliction of the stab wounds to the time of death was estimated at between five to six minutes, although the victim could have lived up to 30 minutes. The linear incisions would have been painful wounds; however, it was impossible to say with medical certainty whether the victim was conscious at the time they were inflicted.

6

Both Majors and Vaden described the victim, who was fourteen years old at the time of the murder, as being a "B" and "C" student who loved school. He was small for his age and was the smallest in his group of friends. The victim was not violent in nature and did not carry a weapon.

Since the murder of her son, Majors' health has deteriorated. She has been on medication and will not leave the house except for doctor appointments. She has had a nervous breakdown, suffers from panic attacks, and has not been able to sleep at night since the murder. Vaden testified that since the murder he has suffered from mood swings and blames himself for his brother's death.

For the defense, the appellant's cousins, James and Carol Sue Little, and the appellant's half-sister, Sharon Fuchs, testified concerning the appellant's difficult childhood. The appellant grew up around several small towns in Texas. His father died of a heart attack when the appellant was four years old. After that, the appellant's mother remarried, and Fuchs was born. Eventually, the appellant's step-father had a nervous breakdown and was committed to a mental institution, and the appellant's mother divorced him. After the divorce, the appellant's mother worked and went out regularly in the evenings. During the evenings, the children would either stay with relatives or go with their mother to bars. Sometimes their mother would leave the children by themselves at a bar while she left with a man for a couple of hours. Men often spent the night at the house, and the children could sometimes hear their mother having sexual relations with them. The mother would not stop if the children came in the room, and Fuchs was sometimes forced to participate while her mother watched.

An uncle, who was a pedophile, sometimes babysat the children. The appellant's mother continued to let the uncle babysit even though she knew this. One time, Fuchs saw the uncle rape the appellant. She went to get her mother, but the incident was never discussed. The mother would sometimes grab the appellant between his legs and

7

would watch him use the bathroom.

After being raped by his uncle, the appellant always appeared angry and would get in trouble. He started running away from home and walking the streets. Eventually, the appellant was sent to a home for children and was later sent to prison on two different occasions. After the appellant returned from prison, he was more angry and strange. He started having seizures about every three days, and he lived in a shack behind the house. The appellant was sent to a state mental institution after he climbed a water tower and threatened suicide.

The appellant met Tammy Middlebrooks when she was seventeen years old. They dated for two or three months and got married in early 1986. The relationship was strange, and both seemed to be unstable. For a brief time, the couple lived with Fuchs and the appellant's mother. The appellant did not have a job, so he and Tammy would sometimes spend the day having sex or walking around town. Fuchs identified a document titled "Debow's Revenge" as being in the appellant's handwriting. The document was found in the appellant's room, and Fuchs turned it over to the police at their request. This handwritten document told in detail how "Debow" would seek revenge against certain people.

A psychologist, Dr. Jeffrey L. Smalldon, testified that he performed a psychological and neuropsychological evaluation on the appellant at the request of defense counsel. From his interviews and testing of the appellant and his review of numerous records documenting the appellant's contact with a wide variety of mental health professionals, the appellant's educational records, and his records from the Texas Department of Correction, Dr. Smalldon determined that the appellant had a severe borderline personality disorder, which is marked by an inconsistency in behavior. Dr. Smalldon found that the characteristics of borderline personality disorder, including instability of mood, seeing either the best or the worst in others, marked identity disturbance, impulsive and reckless behavior, poor control over anger, recurring suicidal

8

or self-destructive gestures, and intense fear of abandonment, were either observed or documented in the appellant's historical records.

Dr. Smalldon also found significant antisocial and schizotypal traits, a history of mixed substance and alcohol abuse, an organic personality change, and a seizure disorder. The appellant also has a mild functional brain impairment, which would cause the appellant to have a greater degree of impulsivity and an inability to delay some of his responses. A significant number of mental health professionals who examined the appellant found signs of malingering. Dr. Smalldon testified that this was not necessarily inconsistent with having a mental illness, describing the appellant as a chronic liar.

From his review of the appellant's social history, Dr. Smalldon noted as significant the lack of parental supervision while the appellant was growing up and sexual and physical abuse by his mother and other relatives. Dr. Smalldon observed that the appellant exhibited many of the characteristics seen in adults who were sexually abused as children.

As to the appellant's account of his involvement in the murder, Dr. Smalldon testified that the appellant claimed more responsibility in his interview with him than the appellant did in his video-taped statement to the police. The appellant never expressed any remorse to Dr. Smalldon.

In rebuttal, the state presented the testimony of Dr. Michael McElroy, the Director of Psychological Services for the State of Tennessee at Middle Tennessee Mental Health Institute (MTMHI). Dr. McElroy testified that based on the results of the Minnesota Multiphasic Personality Inventory (MMPI) administered on the appellant by Dr. Smalldon, it was his opinion that the appellant was exaggerating his mental state. While Dr. Smalldon testified that the appellant may have been overreporting some of his symptoms, he did not believe that the profile was obviously invalid. Dr. McElroy acknowledged that borderline personality disorder is a mental illness and that all of the appellant's records indicate he

has some form of personality disorder.

Dr. Willis Marshall testified that he examined the appellant while he was at MTMHI in 1987 and determined that the appellant was competent to stand trial, that he did not have an insanity defense, and that he was not committable. Dr. Marshall further stated that there was no finding of mental illness and that he generally did not consider personality disorder as a mental illness. Dr. Marshall found several indications that the appellant was trying to convince them he had more of a mental problem than he really did.

On cross-examination, Dr. Marshall admitted that the Diagnostic and Statistical Manual of Mental Disorders, Fourth Revised Edition, includes borderline personality disorder as a diagnosable form of mental illness. He also admitted that every mental health professional who examined the appellant found some form of diagnosable mental illness.

Based on this proof, the jury sentenced the appellant to death for the murder of Kerrick Majors.

## II. CONSTITUTIONALITY OF "HEINOUS, ATROCIOUS, AND CRUEL" AGGRAVATING CIRCUMSTANCE

The appellant contends that the trial court's instruction on the heinous, atrocious, or cruel aggravating circumstance was unconstitutional. Relying primarily on Houston v. Dutton, 50 F.3d 381 (6th Cir.), cert. denied, --- U.S. ---, 116 S. Ct. 272 (1995), Rickman v. Dutton, 854 F.Supp. 1305 (M.D. Tenn. 1994), and Maynard v. Cartwright, 486 U.S. 356, 108 S. Ct. 1853 (1988), the appellant argues that the term "heinous" is unconstitutionally vague on its face, and this vagueness was not cured either through the use of the qualifier "especially" or by the use of "depravity of mind."

At the sentencing hearing, the trial court charged the jury on this aggravating

10

circumstance as it is set forth in Tennessee Code Annotated section 39-2-203(i)(5)(1982),[2] which provided that the murder was heinous, atrocious, or cruel in that it involved torture or depravity of mind. The trial court gave the following jury instruction:

> No death penalty shall be imposed unless you unanimously find that the State has proven beyond a reasonable doubt the following specified statutory aggravating circumstance:
>
> The murder was especially heinous, atrocious, or cruel, in that it involved torture or depravity of mind.
>
> In determining whether or not the State has proved the aggravating circumstance, you are governed by the following definitions:
>
> Heinous means grossly wicked or reprehensible, abominable, odious, vile.
>
> Atrocious means extremely evil or cruel, monstrous, exceptionally bad, abominable.
>
> Cruel means disposed to inflict pain or suffering, causing suffering, painful.
>
> Torture means the infliction of severe physical or mental pain upon the victim while he remains alive and conscious.
>
> Depravity means moral corruption, wicked or perverse act.

Our supreme court has consistently held that the language of Tennessee Code Annotated section 39-2-203(I)(5)(1982) (repealed 1989) is not unconstitutionally vague or overbroad. State v. Dicks, 615 S.W.2d 126, 131-32 (Tenn. 1981). See also State v. Black, 815 S.W.2d 166, 181 (Tenn. 1991); State v. Barber, 753 S.W.2d 659, 670 (Tenn. 1988).

In State v. Williams, 690 S.W.2d 517 (Tenn. 1985), our supreme court reversed the sentence of death and remanded for a new sentencing hearing after finding "that the court did not instruct the jury concerning the legal significance of the words 'heinous,' 'atrocious,' 'cruel,' 'torture,' or 'depravity of mind' as those terms are used in the

---

[2]Tennessee Code annotated section 39-13-204(I)(5), effective November 1, 1989, states that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Although the sentencing hearing was held in 1995, the murder was committed in 1987. Accordingly, the jury was properly charged as to the "torture or depravity of mind" standard in existence at the time of the crime. See State v. Cazes, 875 S.W.2d 253, 267 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S. Ct. 743 (1995); State v. Smith, 893 S.W.2d 908, 920 (Tenn. 1994), cert. denied, --- U.S.---, 116 S. Ct. 99 (1995).

aggravating circumstance defined in T.C.A. § 39-2-203(i)(5)." Id. at 532. The court found the statute to be constitutional "so long as the abstract terms employed therein are construed and interpreted as we have done in this opinion and other opinions of this Court." Id. at 533. Jury instructions on the definitions are necessary to preclude "a basically uninstructed jury" that "cannot lawfully impose the death penalty," Id. (citing Godfrey v. Georgia, 446 U.S. 420, 429, 100 S. Ct. 1759, 1765 (1980)). In the present case, the trial court clearly instructed the jury in accordance with Williams.

Furthermore, the appellant's reliance on federal case law is unfounded. In Houston v. Dutton, the trial court did not instruct the jury on the definitions of any of the terms set forth in the heinous, atrocious, or cruel aggravating circumstance. Houston, 50 F.3d at 387. In Rickman v. Dutton, the trial court defined the terms "heinous," "atrocious," and "cruel" for the jury but did not define the terms "torture" or "depravity of mind." Rickman, 854 F.Supp. at 1309-10. The district court held that the "especially heinous" instruction, even as limited by the definition of heinous as "extremely wicked or shockingly evil," was unconstitutionally vague. Id. at 1310. The district court also held that the instruction was vague despite the inclusion of the term "depravity of mind," which it also found to be unconstitutionally vague. Id. In contrast to the facts of these cases, the trial court in the present case instructed the jury on all the definitions required under Williams.

Regardless, this court is not bound by these federal rulings. Instead, we are only required to follow the applicable constitutional rulings of the United States Supreme Court. See State v. Bush, 942 S.W.2d 489, 521 n.11 (Tenn. 1997); State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984); State v. Bowers, 673 S.W.2d 887, 889 (Tenn. Crim. App. 1984); see also State v. Vickers, 159 Ariz. 532, 768 P.2d 1177, 1188 n.2 (1989) (Arizona Supreme Court refuses to follow Ninth Circuit's invalidation of Arizona death penalty statute).

Finally, although not raised by the appellant, the jury's application of this aggravating circumstance is clearly supported by the record. The appellant admitted in his

statement to police that the victim was slapped, beaten with brass knuckles, and hit with a stick in his mouth and on his testicles. A stick was jabbed into the victim's anus, his nose was burned with a cigarette lighter, a knife was dropped on his chest, his wrist was slashed, and he was forced to swallow urine. Superficial linear incisions in the form of an "X" were slashed across the victim's chest before the fatal stab wound. According to the medical examiner, the victim could have lived from 5 to 30 minutes after being stabbed. From the victim's capture to the time of the fatal stab wound, approximately four hours elapsed.

Based on these facts, the proof of torture is gruesome and overwhelming, depicting acts that are abhorrent and unspeakably cruel. In essence, the facts of this case define torture. Cf. State v. Smith, 868 S.W.2d 561, 579-80 (Tenn. 1993) (multiplicity of wounds, infliction of gratuitous violence on victims, and needless mutilation); State v. McNish, 727 S.W.2d 490, 494 (Tenn. 1987) (victim beaten several times and remained alive and at least partially conscious throughout ordeal); State v. Zagorski, 701 S.W.2d 808, 814 (Tenn. 1985) (infliction of gratuitous violence and needless mutilation of victims who were already helpless from fatal wounds).

### III. INTRODUCTION OF EVIDENCE OF VICTIM'S RACE AS A MOTIVE FOR THE COMMISSION OF THE CRIME

The appellant contends that the state was improperly allowed to introduce irrelevant and inflammatory evidence tending to exploit its belief that the murder of the victim was based upon the appellant's racist beliefs. Specifically, the appellant objects to the testimony of Shannon Stewart, who testified that he had conversations with the appellant on the morning of the crime in which the appellant expressed racial animosity. The appellant contends that the prosecutor's closing argument also improperly called on the jury to impose the death penalty because of the appellant's racist beliefs. We find this issue to be without merit.

Prior to the sentencing hearing, the appellant filed a motion in limine seeking

13

exclusion of this evidence of racial belief. At the hearing on the motion, the appellant argued that while this testimony was relevant at the first trial to show premeditation, the state was not required to prove the elements of first-degree murder at the resentencing hearing, and the prejudicial impact of this testimony would be extreme. The trial court took the matter under advisement until Stewart was called as a witness, at which time it made the following ruling:

> What I needed to do and did do is read the transcript so I could understand exactly what the questions and answers were, and it appears to me that it is relevant, and I have conducted the requisite balancing test and find it to be admissible, if the State chooses to introduce it.
>
> In response to your argument that the stated basis of admissibility previously was to prove premeditation. You have to put that in the context. That was in a case where both phases were being tried, and the proof was being introduced in the guilt or innocence phase, so the State would not have been addressing that at sentencing. For purposes of this hearing, where this jury is just hearing all this for the first time, the evaluation has to be made independent of that totally, which, you know, for the reason I just stated, did not address before, but it is relevant and admissible for sentencing. That is the evaluation I have conducted, not based on what was done the last time, because it is apples and oranges.

Stewart then testified before the jury about his conversations with the appellant prior to the night of the murder:

> [The appellant] was telling me stuff, you know, that I really didn't, you know, care to listen to at that age, you know, telling me like he was KKK and he said a nigger walked up to him and said, Hi, and he hit him in his mouth and he had a little ring on, a tiger head, and he showed me some blood in the creases of his ring, and stuff.

Based on this proof, the state made the following argument during the final closing argument:

> The testimony in this case tells you more about Donald Middlebrooks from the days it happened, from Shannon Stewart, than all the psychologists that you can bring in this courtroom, from 1989 to the present. Shannon Stewart told you more about this man than any Ph[.]D. could ever do.
>
> * * * *
>
> And when we found out from his psychologist that the psychologist had conveniently neglected to dictate on the transcription words such as we [sic] used racial epithets. The complexity of this murder dealt with race.
>
> * * * *
>
> You decide this case on evidence. We've said that, and there are some pretty ugly things in this case that are embarrassing and frightening to many of you on the jury. What happened in this case is every mother's worst

14

nightmare, but even so, in this case, because, no doubt, Kerrick Majors had been told that there were a small group of people in this world who will never like you, no matter what you do, what you become, or how you treat them. They will only see your skin.

We note that on direct appeal, the supreme court held that Stewart's testimony was admissible:

The testimony is clearly relevant to show premeditation and a motive for the victim's brutal slaying. The testimony is also relevant to contradict the defendant's statement that Roger Brewington was the leader in the commission of the offense. In addition, given the relevancy of the statements, we find that the prejudicial effect did not substantially outweigh their probative value. State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). Accordingly, we hold that the trial court correctly admitted Shannon Stewart's testimony about these statements.

Middlebrooks, 840 S.W.2d at 330.

Tennessee Code Annotated section 39-2-203 has been interpreted as only permitting introduction of evidence relevant to punishment at the sentencing phase. Evidence is relevant to punishment only if it is relevant to a statutory aggravating circumstance or to a mitigating circumstance raised by the defendant. Cozzolino v. State, 584 S.W.2d 765, 767-68 (Tenn. 1979); see also State v. Adkins, 653 S.W.2d 708, 715-16 (Tenn. 1983).

Regardless, at a resentencing hearing, both the state and the defendant "are entitled to offer evidence relating to the circumstances of the crime so that the sentencing jury will have essential background information 'to ensure that the jury acts from a base of knowledge in sentencing the defendant.'" State v. Adkins, 725 S.W.2d 660, 663 (Tenn. 1987) (quoting State v. Teague, 680 S.W.2d 785, 788 (Tenn. 1984)); see also State v. Bigbee, 885 S.W.2d 797, 813 (Tenn. 1994); State v. Nichols, 877 S.W.2d 722, 731 (Tenn. 1994), cert. denied, 513 U.S. 1114, 115 S. Ct. 909 (1995).

In State v. Teague, 897 S.W.2d 248 (Tenn. 1995), the supreme court held that "[e]vidence that is admissible as being relevant to the issue of guilt or innocence may also be admissible at a resentencing hearing in support of a mitigating circumstance." Id.

15

at 253. The issue raised on appeal in <u>Teague</u> was whether the defendant should be allowed to present proof of innocence at a resentencing hearing. The supreme court noted that the "test for admissibility is not whether the evidence tends to prove the defendant did not commit the crime, but, whether it relates to the circumstances of the crime or the aggravating or mitigating circumstances." <u>Id</u>. at 252.

In the present case, Stewart's testimony at the resentencing hearing was relevant to the nature and circumstances of the murder, especially to show the appellant's motive and intent. From the record, it is clear that race was an integral dynamic of the circumstances surrounding this murder, and the jury was entitled to have this base of knowledge in sentencing the appellant.

Moreover, Stewart's testimony was relevant to rebut the statutory mitigating circumstances raised by the appellant. Among others, the appellant raised these statutory mitigating circumstances: (1) the appellant acted under extreme duress or under the substantial domination of another person, and (2) the capacity of the appellant to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime, but which substantially affected his judgment. Tenn. Code Ann. § 39-2-203(j)(6), (8)(1982) (repealed). These mitigating circumstances were raised to offer an explanation for the appellant's participation in the murder. Therefore, although Stewart's testimony was presented during the state's case-in-chief rather than in rebuttal, it was still relevant to rebut the mitigating circumstances. Stewart testified after the jury was shown the appellant's video-taped statement to the police. In this statement, the appellant depicted Brewington as the primary perpetrator of the offense and attributed the racist remarks to Brewington. Clearly, Stewart's testimony was offered to rebut these claims by the appellant in his statement to the police.

The state was also properly allowed to address this proof during closing arguments. It is well established that closing argument must be temperate, must be

predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). The prosecutor may state an ultimate conclusion which would necessarily follow if the testimony of the prosecution witnesses were believed by the jury. State v. Brown, 836 S.W.2d 530, 552 (Tenn. 1992). Moreover, both parties must be given the opportunity to argue not only the facts in the record but any reasonable inferences therefrom. See Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976).

Based in great measure upon the role of the prosecutor in the criminal justice system, more restrictions are placed on the state than the defendant. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Accordingly, "the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." Id. Here, the prosecutor's argument was based on proof of the appellant's racial animosity and the reasonable inference that it played a significant role in the appellant's participation in this murder.

Finally, even if it was error to admit Stewart's testimony and to allow the state to address this proof during closing argument, such error was harmless in that the proof was cumulative of other admissible evidence. See Hartman v. State, 896 S.W.2d 94, 100-101 (Tenn. 1995). The appellant made several racial comments during his videotaped statement to the police, which was viewed by the jury. Furthermore, Dr. Smalldon, the defense's expert witness, admitted that the appellant used several racial epithets while being interviewed by him. Dr. Smalldon also testified that the appellant told him all three, "[the appellant] and Roger and Tammy, made racial taunting remarks at the victim."

## IV. PROSECUTORIAL MISCONDUCT[3]

---

[3]Although not affecting the sentence in this case, based on our review of the record, we encourage prosecutors to refrain from using antiquated and inappropriate terms when referring to those who are mentally ill or challenged. We offer this suggestion in light of our supreme court's appointment of the Commission on Racial and Ethnic Fairness in 1995. Terms such as "crazy" and "retarded," especially when used by officers of the court in a derisive context, reflect poorly on the entire judicial system.

17

The appellant contends that his right to due process as guaranteed by both the Tennessee and United States Constitutions was violated because the prosecutor argued that the victim's family and the district attorney's office wanted a death sentence imposed and because the prosecutor argued that the Bible supported imposition of the death penalty. We find that any improper closing argument was harmless error.

The standard of review in determining whether counsel was allowed too much latitude during closing argument is abuse of discretion. Sutton, 562 S.W.2d at 823. As previously stated, closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. Id. Based in great measure upon the role of the prosecutor in the criminal justice system, the most restrictions are placed on the state. Coker, 911 S.W.2d at 368. Accordingly, "the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." Id.

In reviewing the propriety of argument in a capital sentencing proceeding, the reviewing court must determine whether the prosecutor's comments affected the sentencing decision. State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988). "If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment." Id. (citing Caldwell v. Mississippi, 472 U.S. 320, 341, 105 S. Ct. 2633, 2646 (1985)). This court has set forth five factors to consider in determining whether any improper conduct was prejudicial:

> (1) the conduct complained of viewed in the context and in light of the facts and circumstances of the case, (2) any curative measures undertaken by the court and the prosecution, (3) the intent of the prosecutor in making the improper statement, (4) the cumulative effect of the improper conduct and any other errors in the record, and (5) the relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). The adoption of these considerations was approved by our supreme court in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

While the prosecutor's comments during closing argument were improper,

we find that such error did not affect the jury's decision.

The prosecutor made the following comment, without objection, during his final closing argument concerning the desire of the victim's family and the district attorney general's office for the jury to impose the death penalty:

His family asks you to impose the death penalty. The State asks you to impose the death penalty. The facts support it. He deserves it. Justice demands it on the facts and the law.

Overruling the decisions in Booth v. Maryland, 482 U.S. 496, 107 S. Ct. 2529, and South Carolina v. Gathers, 490 U.S. 805, 109 S. Ct. 2207 (1989), the Supreme Court held in Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597 (1991), that if a state "chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eight Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne, 501 U.S. at 827, 111 S. Ct. at 2609. The holding in Payne was adopted by our supreme court in State v. Brimmer, 876 S.W.2d 75, 86 (Tenn.1994).

The Supreme Court in Payne stated in a footnote:

Our holding today is limited to the holdings of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. Booth also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case.

Payne, 501 U.S. at 830, n.2, 111 S. Ct. at 2611, n.2.

Here, the prosecutor improperly argued that the victim's family members were asking the jury to impose the death penalty. No objection was made, and therefore, no curative measures were taken. Accordingly, the appellant has waived this issue. See Tenn. R. App. P. 36(a). In any event, under Judge, there was no prejudice to the appellant. There was no testimony presented during the resentencing hearing concerning the opinion of the victim's family as to the appropriate sentence. Moreover, this was the

19

only such comment made by the state. Accordingly, in light of the overwhelming strength of the state's case, the prosecutor's statement, albeit improper, was not prejudicial. See also State v. Ricky Thompson, No. 03C01-9406-CR-00198 (Tenn. Crim. App. Jan. 24, 1996), perm. app. denied concurring in results only (Tenn. July 1, 1996).

As to the prosecutor's argument that his office was asking the jury to impose a death sentence, this type of argument has also been held improper. See Brooks v. Kemp, 762 F.2d 1383, 1410 (11th Cir. 1985). In Brooks, the prosecutor argued that it was the practice of the district attorney general's office to seek the death penalty in only a few cases. Here, the prosecutor merely stated that his office was asking for a death sentence. As pointed out by the state, the jury already knew that the district attorney general's office was seeking the death penalty. Because the prosecutor did not further qualify his argument by indicating that his office only sought the death penalty in a limited number of cases, as in Brooks, this argument was not error. Applying the criteria set forth in Judge, this single statement did not affect the jury's decision.

Finally, the appellant complains about the prosecutor's references to the Bible:

> Mr. Barrett has asked you to consider something else. He has asked you to consider the book where the words of our Lord are written, vengeance is mine.
>
> This lady has come to this courtroom, not for vengeance, but to turn this over to you, the law. If she was after vengeance, this case would have never made it here.
>
> The same book that says vengeance is mine says whoever sheddeth man's blood, whoever sheddeth man's blood, then by man shall his blood be shed. The Lord meant for the system of laws and justice to govern societies wherever they are, and you are that tool of the Lord, that part of justice--

At this point, defense counsel objected. The trial judge did not agree with defense counsel that the state had gone beyond the scope of rebuttal; however, she stated "I do believe that I'll ask the General to move on to something else."

Previously, during defense counsel's closing argument, he had argued:

20

We do not apologize for asking for mercy, asking for leniency or sympathy for Donald Middlebrooks. Our life is given by our creator, and it is not to be taken lightly by man or our government using the guise of due process and the judicial system as a thinly veiled guise for vengeance; vengeance, which I think our creator says is his and not ours.

* * * *

What is the reason you are here? It is to decide, very simply, whether this man is going to live or die, and I submit to you, ladies and gentlemen of the jury, that when Donald Middlebrooks arrives at his inevitable rendezvous with death, even in a prison cell, it should be at the time and discretion of his maker, in whose image we are all made, and not at the artificial time selected by the State of Tennessee, when a lever is pulled and the sanctity of human life, in this day and time, is even further diminished by an action of the State of Tennessee, and I submit to you, based upon all the evidence and facts in this case, the only verdict that can be returned consistent with the law and consistent with what the views of our society should be is that this young man should meet his maker in a cell by the Cumberland River, Riverbend Prison, and not at the artificial time when the State of Tennessee chooses to usurp the prerogative of our Lord.

It is well established that it is inappropriate to make references to Biblical passages or religious law during a criminal trial. See State v. Stephenson, 878 S.W.2d 530, 541 (Tenn.1994) (judge's references to Biblical passage); State v. Harrington, 627 S.W.2d 345, 350 (Tenn. 1981) (foreman read biblical passages to other jury members); Kirkendoll v. State, 198 Tenn. 497, 521-22, 281 S.W.2d 243, 254 (1955) (prosecutor's reference to Mosaic law). Such references, however, do not constitute reversible error unless the appellant can clearly establish that they had some effect on the verdict. Stephenson, 878 S.W.2d at 541; Kirkendoll, 198 Tenn. at 522, 281 S.W.2d at 254.

In Kirkendoll, the prosecutor referred to the Mosaic Law during the voir dire examination. The supreme court commented that unless such a remark clearly would have had some effect on the verdict it did not constitute reversible error, particularly where the trial judge remonstrated with the district attorney general and told him not to use a reference of that kind again. Kirkendoll, 198 Tenn. at 522, 281 S.W. 2d at 254; see also, State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994) (prosecutor's quote from Bible and interjection of religious law was trivial, at most, in relationship to remainder of argument and did not effect verdict).

Upon examining the above-quoted remarks in light of the entire closing

argument, defense counsel's religious references, the facts and circumstances surrounding the case, and the overall strength of the state's case, this court finds that the improper comments made during the state's argument did not affect the verdict to the prejudice of the appellant.

## V. CONSTITUTIONALITY OF THE DEATH PENALTY STATUTES

The appellant raises several challenges to the constitutionality of Tennessee Code Annotated section 39-2-203 and -205 (1982) (repealed 1989). As acknowledged by the appellant, our Supreme Court has repeatedly rejected these arguments. See, e.g., Bigbee, 885 S.W.2d at 813-14; Brimmer, 876 S.W.2d at 87-88; Cazes, 875 S.W.2d at 268-69; State v. Hutchison, 898 S.W.2d 161, 173-74 (Tenn. 1994), cert. denied, ___ U.S. ___, 116 S. Ct. 137, 133 L.Ed.2d 84 (1995); State v. Bane, 853 S.W.2d 483, 488-89 (Tenn. 1993); State v. Smith, 857 S.W.2d 1, 21-24 (Tenn. 1993); Black, 815 S.W.2d 166, 181, 185; State v. Melson, 638 S.W.2d 342, 366-68, (Tenn. 1982).

As an intermediate appellate court, it is beyond our statutory function to overrule the holdings of our supreme court. See Reimann v. Huddleston, 883 S.W.2d 135, 137 (Tenn. App. 1993), perm. app. denied (Tenn. 1994). Thus, we decline the invitation to revisit these issues which have previously been decided.

## VI. PROPORTIONALITY REVIEW[4]

Although not raised by the parties, this court is required to review death sentences in the manner mandated by Tennessee Code Annotated section 39-13-206(c)(1). Here, the sentence was not imposed in an arbitrary manner. Additionally, the evidence presented in support of the valid aggravating circumstance outweighed the

---

[4]While the trial court filed a report with the supreme court clerk in Nashville as required by Rule 12, Tennessee Supreme Court Rules, after the appellant's first trial, it failed to file a new report with the Clerk or include one in the technical record after the appellant was resentenced. However, our supreme court has held that the absence of this report does not necessarily preclude adequate appellate and comparative proportionality review. Smith, 893 S.W.2d at 927.

22

evidence introduced to establish any mitigating circumstances beyond a reasonable doubt.

"No two cases are alike, and no two defendants are alike." Barber, 753 S.W.2d at 665. However, a comparative proportionality review, which considers both the nature of the crimes and of the defendant, reveals that the death sentence in this case was neither excessive nor disproportionate. Irick, 762 S.W.2d 121; State v. O'Guinn, 709 S.W.2d 561 (Tenn. 1986); State v. Coe, 655 S.W.2d 903 (Tenn. 1983).

## VII. CONCLUSION

We have carefully considered the issues raised by the appellant as to the resentencing hearing and have determined that none has merit. Accordingly, we affirm the appellant's sentence of death. The sentence of death will be carried out as provided by law on the 27th day of April, 1998, unless otherwise ordered by our supreme court.

_____
CURWOOD WITT, JUDGE

CONCUR:

_____
JOE G. RILEY, JUDGE

_____
JOE H. WALKER, III, SPECIAL JUDGE

23